Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| JLG CONSULTING ENGINEERING, P.S.C.<br><br>Apelado<br><br>V.<br><br>TETRAD ENTERPRISES LIMITED LIABILITY COMPANY<br><br>Apelante | KLAN202400046 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2020CV05183<br><br>Sobre: Cobro de Dinero |
|---|---|---|

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Adames Soto y la Jueza Martínez Cordero

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 23 de agosto de 2024.

El 16 de enero de 2024, compareció ante este Tribunal de Apelaciones, Tetrad Enterprises, LLC (en adelante, TETRAD o parte apelante), por medio de recurso de *Apelación.* Mediante este, nos solicita que revisemos la *Sentencia* emitida el 28 de noviembre de 2023, y notificada el 29 de noviembre de 2023, por el Tribunal de Primera Instancia, Sala Superior de San Juan. En virtud del aludido dictamen, el foro *a quo* declaró Ha Lugar la *Demanda* presentada por JLG Consulting Engineering, P.S.C. (en adelante, JLG o parte apelada).

Por los fundamentos que adelante se esbozan, se confirma la *Sentencia* apelada.

### I

El recurso de marras tiene su génesis en una *Demanda* sobre cobro de dinero, instada por la parte apelada, el 25 de septiembre

de 2020, contra TETRAD.[1] De entrada, precisa destacar que, esta es la tercera ocasión en que las partes comparecen ante esta Curia dentro del mismo pleito judicial. De manera que, el trámite procesal del caso fue plasmado en dos (2) *Resoluciones* emitidas por este mismo Panel, en los casos con designación alfanumérica KLCE202300165 y KLCE202300765, el 20 de abril de 2023 y, el 31 de agosto de 2023, respectivamente. En vista de ello, adoptamos por referencia el tracto procesal esbozado en las determinaciones emitidas en ambos recursos, y nos circunscribimos a reseñar las incidencias procesales ocurridas con posterioridad.

En lo que concierne a la controversia ante nos, el 10 de octubre de 2023, fue celebrado el juicio en su fondo. Allí, testificaron el ingeniero José M. Izquierdo Encarnación (en adelante, Ingeniero Izquierdo Encarnación), como perito de la parte apelada, el ingeniero José Luis García, presidente de JLG, y Luis Díaz Díaz, gerente de proyectos de JLG. Por su parte, TETRAD no presentó ningún testigo.

Escuchada y aquilatada la prueba presentada, el Tribunal de Primera Instancia dictó la *Sentencia* apelada, el 28 de noviembre de 2024, notificada al siguiente día.[2] En virtud de esta, el foro primario consignó un total de ciento dieciocho (118) determinaciones de hechos. De estas, seis (6) habían sido enumeradas en la *Resolución* emitida por el mismo foro, el 17 de octubre de 2022[3], noventa y ocho (98) formaron parte de otra *Resolución* emitida el 16 de mayo de 2023[4], y se incluyeron catorce (14) como determinaciones de hechos adicionales. Por su pertinencia, transcribimos las mismas a continuación, según consignadas por el tribunal de instancia en su dictamen:

---

[1] Apéndice del recurso de apelación, págs. 1-23.
[2] *Íd.*, págs. 727-750.
[3] Dicho dictamen fue notificado el 18 de octubre de 2022. Véase, apéndice del recurso de apelación, págs. 121-128.
[4] Apéndice del recurso de apelación, págs. 673-692.

> ### *Resolución* de 17 de octubre de 2022 [entrada 91]:[5]
>
> 1.    No existe un contrato escrito y firmado por ambas partes.
>
> 2.    Entre el Departamento de Recursos Naturales y Tetrad Enterprises Limited Liability Company, se suscribió un contrato intitulado "Non - Professional Service Contract" cuyo número es 2020-000076, de fecha 26 de marzo de 2020, para entre otras cosas, alquilar y sustituir ciertas bombas, equipo, mantenimiento y costos de combustible en diez estaciones de bombas para el control de inundaciones.
>
> 3.    A comienzos del año 2020, Luis Hernández Rivera, a nombre de Tetrad, le pidió al Ingeniero José Luis García que le proveyera algún recurso de su oficina ("delineante") para realizar un dibujo esquemático de los rumbos por donde estaba instalada y/o se instalaría la tubería necesaria para cumplir con el contrato que estaba en gestación entre Tetrad y el DRNA.
>
> 4.    Previo a la contratación de Tetrad, el DRNA tenía diez (10) estaciones de bombas en las cuales tenía instaladas bombas portátiles para el control de inundaciones alquiladas a otro proveedor de servicio.

---

[5] Como parte de dicha *Resolución*, se hicieron además las siguientes determinaciones de hechos, algunas de las cuales constituyen admisiones del perito de la parte demandada bajo la Regla 803 de Evidencia:

    a) El perito de la parte demandada Ingeniero Juan F. Charles Santana, opina que las facturas de la parte demandante fueron computadas de acuerdo con las guías del Colegio de Ingenieros y Agrimensores de Puerto Rico.

    b) El perito de la parte demandada Ingeniero Juan F. Charles Santana, categoriza el trabajo de la parte demandante dentro de la Categoría 1 del Manual del Colegio de Ingenieros y Agrimensores de Puerto Rico.

    c) El perito de la parte demandada Ingeniero Juan F. Charles Santana, rindió un informe para la parte demandada el 26 de abril de 2022.

    d) Como parte de dicho informe, identificó la encomienda dada por la parte demandada de la siguiente forma:

        2. -Encomienda: Se nos solicita hacer una evaluación profesional valor del trabajo realizado por JLG Consulting Engineering para determinar si este trabajo realizo es de categoría 5, según el manual del Colegio de Ingeniero y Agrimensores de Puerto Rico. Se nos encomienda tres asunto[s] fundamentales, Primero revisar, investigar los criterios y estándares aplicables a este tipo de proyecto. Segundo, si el trabajo realizado por la firma JLG Consulting Engineering, P.S.C cumple con los estándares mínimos para el reemplazo de bombas con sus correspondientes tuberías en 10 estaciones bombeo de agua pluvial. En tercer lugar, se nos solicita rendir una opinión sobre el valor del servicio ofrecido de acuerdo al nivel de ejecución.

    e) La conclusión del perito en el informe en respuesta a dichas encomiendas lee:

AHORA ESTOY EN POSICION DE CONTESTAR LAS TRES PREGUNTA HECHAS POR TETRAD, Y ES SON COMO SIGUE:

1. - El trabajo de ingeniería realizado por la firma JLG para la firma TETRAD está dentro de categoría 1.

2. - El trabajo de ingeniería realizado por los consultores JLG aun estando dentro de la categoría 1, el mismo no cumplió con las expectativa[s] de ese nivel, estas por debajo.

3. - Basado en los criterios valorativos de este perito se le asigna un total de entre $800.379 y $857,971.

5.  La sección 4.1.1 del Manual de Prácticas Profesionales y Guía para la Compensación de Servicios Profesionales lee:

4.1.1 GENERAL DESCRIPTION

In the computation of charges for professional services, any one of the following schemes may be used:
1. Percentage of cost of work. Fee based on a percentage of an opinion of probable cost or actual cost of work contemplated or constructed;
2. Fixed lump-sum fee;
3. Cost-plus a fixed fee;
4. Payroll cost times a factor plus incurred expenses;
5. Personal services on a per-diem or hourly basis;
6. Cost-plus basis when scope of work is difficult to determine;
7. Retainer fee; and
8. Retainer fee plus per-diem rates.

The decision concerning the acceptable method of computing fees on a particular job necessitates consideration of various important items, each of which has a bearing on the agreement for services to be entered into between the professional and his client, as each contract should be drawn to meet specific conditions.

6.  La única persona en la organización de Tetrad que brega con el Proyecto propiamente desde el punto de vista operacional es el Sr. Luis Hernández.

### *Resolución* de 16 de mayo de 2023 [entrada 162].

7.  La demandante JLG Consulting Engineering P.S.C. es una corporación de servicios profesionales debidamente organizada el 4 de marzo de 1996 por el Ingeniero José Luis García bajo las leyes de Puerto Rico, con Registro Número 102-CP, dedicada, entre otras cosas, a la prestación de servicios de consultoría en el campo de la ingeniería y específicamente en consultoría y diseño de ingeniería mecánica.

8.  La demandada Tetrad Enterprises Limited Liability Company es una compañía de responsabilidad limitada organizada el 14 de noviembre de 2015 bajo las leyes de Puerto Rico, con Registro Número 365228.

9.  El 26 de marzo de 2020, se suscribió el Contrato Número 2020-000076 (en adelante el "Contrato"), entre el "Puerto Rico Department of Natural and Environmental Resources (DRNA) y Tetrad Enterprises Limited Liability.

10. El Contrato entre el DNRA y Tetrad fue suscrito por el entonces Secretario del DRNA Rafael A. Machargo Maldonado en representación del DNRA y por la Sra. Albia Rosado Falcón como Administradora de TETRAD.

11. El Contrato fue inscrito en la Oficina del Contralor de Puerto Rico el 26 de marzo de 2020.

12. El monto total del Contrato fue de $26,708,518.00.

13. Efectivo el 1ro de marzo del 2018, el Ingeniero José Luis García en representación de la parte demandante y el Sr. Luis Hernández en representación de Tetrad prepararon un acuerdo matriz de alianza ("Tetrad-JLG Alliance Master Agreement") en relación a ciertos proyectos a ser desarrollados por las partes. El documento no fue suscrito por el Sr. Hernández, pero aun así las partes estuvieron envueltas en distintos proyectos potenciales.

14. El 6 de abril de 2018, la parte demandante representada por el Ingeniero Luis Díaz y Tetrad representada por el Sr. Luis Hernández, suscribieron un acuerdo intitulado "Mutual Confidentiality And Non-disclosure Agreement". Conforme el mismo, se definió información confidencial como "all proprietary and confidential information of one Party (in each instance, the 'Disclosing Party') disclosed to the other Party (as the 'Recipient'), relating to a possible Combined Heat and Power (CHP) or other alternative energy transaction ('Project' or 'Transaction') between or among 'JLG' or Company, and their respective Clients…". También su dispuso que el intercambio de información confidencial no creaba una obligación de llegar posteriormente a acuerdos.

15. El Contrato entre el DNRA y Tetrad suscrito el 26 de marzo de 2020, no incluye el costo por el combustible "diesel", el que sería facturado por Tetrad por separado mensualmente.

16. El Contrato dispone para la instalación de bombas nuevas sumergidas luego de la remoción de la tubería y bombas existentes, y la instalación de las bombas y las tuberías en las diez (10) estaciones, entre otras cosas, así como el diseño y supervisión, mantenimiento y operación del sistema.

17. Antes de otorgarse el Contrato y a solicitud del Sr. Luis Hernández, en la mañana del 26 de marzo de 2020, el Ingeniero José Luis García le envió un correo electrónico con recomendaciones y sugerencias a considerarse en el Contrato.

18. De acuerdo con el Contrato el DNRA acordó pagar a TETRAD por concepto de compensación hasta un máximo de $26,717,518 millones de dólares pagaderos contra dos cuentas.

19. El Contrato establece que se refiere al reemplazo de bombas de respaldo ("back up pumps") para diez (10) estaciones que se identifican en el Contrato y con costo total estimado de arrendamiento ("Total estimate lease cost") de $21,407,000.00 y que incluye las bombas necesarias, la tubería con los diámetros correctos para las bombas, el diseño y la supervisión, la administración de la construcción, la gestión de la permisología, los permisos y las inspecciones relacionadas, y el mantenimiento y operación del sistema, según detallado en la propuesta sometida en marzo del 2020 unida al Contrato como Anejo "A". ("pumps; piping with correct pipe diameters for pumps; installation; design and supervision; construction management; permit submissions; permit and permit related inspections; and maintenance and operation. This is as detailed in the proposal submitted on March 2020 annex A to the contract.").

20. El Anejo "A" del Contrato consistía en la propuesta fechada 13 de marzo de 2020, suscrita por el Sr. Luis Hernández como Director de Tetrad dirigida a la Sra. Cynthia Rivera, Secretaria Interina del DNRA.

21. De acuerdo con el Anejo "A" del Contrato, los requisitos para las estaciones de bombeo ("Pumps, quantity, flow, lift") fueron provistas por el DNRA.

22. De acuerdo con el Anejo "A" del Contrato, los ingenieros consultores de Tetrad desarrollaron los planos preliminares de las estaciones según construidos ("preliminary sites as built drawings") y cálculos de ingeniería preliminares ("preliminary engineering calculations").

23. De acuerdo al Anejo "A" del Contrato, suscrito por el Sr. Luis Hernández como Director de Tetrad, los ingenieros consultores de Tetrad desarrollaron cálculos de ingeniería preliminares ("preliminary engineering calculations"), que demostraron que la mayoría de la tubería que al momento se encontraba instalada en todas las estaciones, era de un tamaño menor al requerido y toda la tubería estaba incorrecta, por lo que toda la tubería incorrectamente especificada debía ser reemplazada con tubería con los diámetros correctos para obtener el flujo y levante de las bombas. Específicamente se indicó:

Our engineering consultants developed preliminary sites as-built drawings and

preliminary engineering calculations. The calculations showed that most of the piping installed currently at all stations is undersized and all piping wrongly specified shall be replaced with correct pipe diameters to obtain required pumps flows and lifts.

24. La compañía Bermúdez Longo Díaz-Massó, LLC (en adelante, "BLMD") sometió a Tetrad, por conducto de su gerente de proyecto Ing. Jaime Rodríguez, una propuesta fechada 6 de abril de 2020 para el trabajo mecánico relacionado con el Proyecto.

25. La propuesta de BLMD del 6 de abril de 2020 indica claramente que la cotización para el Proyecto está basada en los documentos preparados por José Luis García & Associate, los que se detallan en la propuesta, incluyendo un número de planos identificados como SK-1D al SK – 1D10A.

26. Con fecha de 9 de abril de 2020, BLDM sometió por conducto del Ing. Jaime Rodríguez, gerente de proyecto de Tetrad, una propuesta revisada para el Proyecto. La propuesta revisada de BLDM indica también que la cotización para el Proyecto está basada en los documentos preparados por José Luis García & Associate, los que se detallan en la propuesta.

27. Con fecha de 9 de abril de 2020, BLDM sometió por conducto del Ing. Jaime Rodríguez, gerente de proyecto de Tetrad, una propuesta revisada para el Proyecto. La propuesta revisada de BLDM indica también que la cotización para el Proyecto está basada en los documentos preparados por José Luis García & Associate los que se detallan en la propuesta.

28. Con posterioridad a la propuesta de BLMD se firmó un contrato entre Tetrad y BLDM para el trabajo mecánico del Proyecto. El contrato fue negociado por el Sr. Hernández y su gerente de proyecto el Ingeniero Jaime Rodríguez y fue suscrito por la Sra. Albia Rosado en representación de Tetrad y por el Ing. Francisco Díaz Massó, Presidente de BLMD.

29. El contrato entre Tetrad y BLDM identifica en su primera página a la parte demandante JLG Consulting Engineering como el arquitecto, e incorpora en su Anejo A la propuesta fechada 9 de abril de 2020.

30. BLMD fue la compañía contratada por la demandada Tetrad para la construcción del proyecto a que se refiere el Contrato.

31. JLG proveyó todos los servicios de aprobación de sometimientos y de respuesta a las preguntas que surgieron en el proceso de construcción de los proyectos y JLG procesó todos los "Submittals" sometidos por BLDM y contestó todas preguntas de campo ("Requests For Information").

32. En un correo electrónico del 16 de enero de 2020, dirigido a la Sra. Rebeca Vargas Ruiz, por parte del Sr. Luis Hernández, éste le manifestó:

    Hola Becky
    Ing. Jose Luis García necesita una reunión con ustedes para que los orientes con relación a los decretos de pridco. Ellos son nuestros eng. consultores para todos nuestros proyectos incluyendo Comerio que pronto comenzara entre otros en el pipeline.
    Lo puedes llamar al 787 946 4545
    Jose Luis es muy amigo de nosotros.
    Un Abrazo
    Luigi
    Luigie Hernández
    Director
    Tetrad Enterprises LLC
    Centro Internacional de Mercadeo
    PR165 Guaynabo, PR 00934
            (acentos omitidos en el original)

33. El 14 de abril de 2020, el Ingeniero José Luis García remitió al Sr. Luis Hernández, la factura número 4649 fechada 15 de abril de 2020 por la cantidad de $2,080,000 por concepto de los servicios prestados con relación al diseño y dibujos de construcción del Proyecto.

34. Ese correo electrónico fue recibido por el Sr. Luis Hernández, quien acusó recibo del mismo.

35. La factura número 4649 también le fue enviada al Ingeniero Jaime Rodríguez, Gerente de Tetrad para el Proyecto, mediante correo electrónico del 21 de abril de 2020.

36. A solicitud del Sr. Luis Hernández el Ingeniero José Luis García preparó y envió a Tetrad tres (3) facturas desglosando la Factura Número 4649 en 3 facturas separadas con diferentes fechas para acomodar el pago de las mismas a las fechas de recibo de fondos por Tetrad de parte del DRNA.

37. La Factura Número 4649 por concepto de los honorarios correspondientes a la demandante fue preparada y computada a base de las guías y tarifas establecidas en el Manual del Colegio de Ingenieros y Agrimensores de Puerto Rico para la compensación de servicios profesionales.

38. De acuerdo con el Manual del Colegio de Ingenieros y Agrimensores el término "Costo de Construcción" se define como:

as the total cost to the client for the execution of the work authorized at one time and handled in each separate phase of engineering services, excluding fees or other cost for engineering and legal services, the cost of land, rights of way, legal and administrative expenses, but including the direct cost to the client of all construction contracts; items of construction including labor, materials and equipment purchased or furnished directly by the client (at the market value as if purchased new) for the project.

39. De acuerdo con el Manual del Colegio de Ingenieros y Agrimensores (el 'Manual'), uno de los métodos que se pueden utilizar para calcular los costos u honorarios por servicios profesionales, es un porcentaje del costo estimado o final de construcción de un proyecto.

40. De acuerdo con el Manual del Colegio de Ingenieros y Agrimensores, la Categoría 5 para propósitos de ingeniería incluye adiciones a rehabilitación o reconstrucción de proyectos incluyendo sistemas eléctricos, comunicación de datos, sistemas mecánicos y sanitarios ("Additions to rehabilitation, or reconstruction of projects including electrical, data communication, mechanical and sanitary systems.").

41. La parte demandada admitió en varias ocasiones (por conducto de sus representantes y en la contestación a demanda), que los honorarios correspondientes a la parte demandante deben ser calculados de conformidad con el Manual del Colegio de Ingenieros y Agrimensores de Puerto Rico.

42. El 4 de mayo de 2020 el Ingeniero José Luis García remitió por correo electrónico al Sr. Luis Hernández y a su gerente de proyecto Ingeniero Jaime Rodríguez, la parte del Manual del Colegio de Ingenieros y Agrimensores que entiende establece el cálculo para la factura sometida por concepto del trabajo realizado.

43. En la etapa preliminar del proyecto y a solicitud del Luis Hernández, el Ingeniero Luis Díaz Díaz preparó y envió por correo electrónico un estimado preliminar del costo de construcción incluyendo el cálculo de los honorarios de la parte demandante.

44. En el estimado de los costos de construcción incluido con el correo electrónico se incluyó una partida por la cantidad de $2,157,000 millones

por concepto de los honorarios de la parte demandante.

45. En el correo electrónico el ingeniero Luis Díaz Díaz solicitó confirmación de parte del Sr. Luís Hernández respecto a: (1) la disponibilidad de los fondos del DNRA/FEMA para el proyecto, (2) confirmación de que se podían pagar los honorarios estimados de la demandante, y (3) confirmación de si seguía adelante con los estimados, diseño preliminar, selección final de las bombas y aprobación de los "submittals".

46. El cálculo de la factura sometida a Tetrad por concepto de los servicios prestados ascendente a $2,354,658.50, se hizo basado en un costo de construcción de $20,000,000 y a las tarifas del Colegio de Ingenieros que aplican para el proyecto.

47. El Ing. Luis Díaz Díaz, había hablado con el Sr. Luis Hernández respecto al precio de la propuesta en la que se mencionaban los $2,000,000, incluso antes de entregársela personalmente por escrito.

48. El Sr. Luis Hernández, le había dicho al Ing. Luis Díaz Díaz, que "el primero que vas a cobrar eres tú, José". Después le indicó que iba a cobrar completo en el primer 'setup fee' a someterse al DNRA, y le pidió que "rompiera" la factura en tres facturas, una de un millón y dos de medio millón de pesos".

49. El 26 de marzo de 2020, el Ing. José L. García, hizo recomendaciones al Sr. Luis Hernández sobre el Contrato, entre otras, que Tetrad facturaría los servicios al DRNA 30 días después de firmado el Contrato y que pagaría a JLG $2,000,000 tan pronto recibiera el pago de DRNA.

50. Mediante correo electrónico del 14 de abril de 2020, a las 8:04 de la mañana el Ing. García envió a Luis Hernández la factura número 4649 por la cantidad de $2,080,000 fechada 15 de abril de 2020 por concepto de los servicios de diseño. A ese correo electrónico se le acompañó el Certificado de Relevo Parcial de la Retención en el Origen.

51. El Sr. Luis Hernández, acusó recibo de dicha factura mediante correo electrónico de 14 de abril de 2020, a las 10:17 am.

52. Mediante correo electrónico del 21 de abril de 2020 a las 4:19 de la tarde, el Ing. García envió al Ing. Jaime Rodríguez, Gerente de Proyecto de TETRAD, la factura número 4649 por $2,080,000 anteriormente enviada a Luis Hernández,

incluyendo el Certificado de Relevo Parcial de la Retención en el Origen.

53. Mediante correo electrónico del 20 de agosto 2020 del ingeniero Luis Díaz Díaz dirigido al Sr. Luis Hernández y a la señora Alba Rosado se incluyeron nuevamente las tres facturas número 4649 según desglosadas y se confirmó la conversación telefónica del 24 de julio de 2020 en la que el Sr. Luis Hernández informó que había resuelto su problema con CORE 3 y que pronto tendría los fondos disponibles para pagar los honorarios por concepto del proyecto.

54. El 15 de mayo de 2020, el ingeniero Jaime Rodríguez, Gerente de TETRAD para el Proyecto, cursó comunicación dirigida al Sr. Israel Alicea, Director de Operaciones Regionales del DRNA, informando el progreso de los trabajos en relación al Proyecto. En dicha comunicación se hizo referencia a visitas a todas las estaciones del norte y a las personas que estuvieron presentes, entre ellas, el ingeniero Luis Díaz de parte de JLG Consulting.

55. Además de la preparación de los planos as built" y del diseño y preparación de los planos de construcción, JLG también proveyó todos los servicios de aprobación de los sometimientos ("submittals") y de respuesta a las preguntas que surgieron en el proceso de construcción de los proyectos y procesó todos los "Submittals" sometidos por BLDM y contestó todas preguntas de campo ("Requests For Information") de parte del contratista BLMD.

56. La señora Albia Milagros Rosado Falcón, es soltera y se divorció del Sr. Luis Hernández Rivera en el año 1997.

57. La Sra. Albia Milagros Rosado Falcón, posee un bachillerato en mercadeo, pero no tiene cursos, preparación o certificación de naturaleza alguna en ingeniería.

58. En cuanto a sus funciones en Tetrad, desde el año 2015 se dedica a administrar dicha compañía.

59. Los dueños de Tetrad son Albia M. Rosado Falcón y Luis Hernández Rivera. La función del Sr. Hernández, es una gerencial de como de 'project manager'.

60. En cuanto al Proyecto al que se contrae la acción de epígrafe, la función de la Sra. Rosado Falcón, era administrar el proyecto, lo que es compra, necesidades del proyecto, contratos con subcontratistas, recursos humanos y estar a

cargo de los contratos con los subcontratistas y con los contratistas.

61. En cuanto a la organización de Tetrad, la compañía tiene empleados, entre los que se encuentran dos hijos de ellos de nombres Luis Hernández Rosado y Rigel Hernández Rosado. Uno de ellos llegó hasta el tercer año de ingeniería mecánica pero no terminó y se dedica al mercadeo y el otro todavía está estudiando computadoras y es su asistente.

62. La única persona en la organización de Tetrad que bregó con el Proyecto propiamente desde el punto de vista operacional fue el Sr. Luis Hernández Rivera, quien también es conocido como "Luigi".

63. La Sra. Rosado Falcón, suscribió el Contrato en representación de Tetrad a pesar de que declaró que la firma de contratos no estaba entre sus funciones.

64. A pesar de su posición en Tetrad, la Sra. Rosado Falcón, no tuvo intervención alguna en la negociación, ni en la obtención del contrato, ni intervino o participó en la selección de los contratistas, en la selección de Bermúdez Longo Díaz-Massó, MWI, ni participó en alguna reunión o en alguna negociación relacionada con la obtención del Contrato, ni en la preparación de la propuesta sometida al DRNA en relación al Contrato, limitándose a firmarlo por instrucciones de sus abogados.

65. La única persona en Tetrad que tuvo que ver todo con respecto a la obtención del Contrato fue Luis Hernández Rivera, incluyendo la identificación de los contratistas del Proyecto.

66. TETRAD no ha realizado ningún pago a la parte demandante con relación a los servicios prestados en el Proyecto.

67. En relación con la propuesta sometida al DNRA que culminó en la otorgación del Contrato, la Sra. Rosado Falcón no tuvo participación o intervención en la redacción de la propuesta, ni la vio antes que se enviara, ni Luis Hernández la consultó a pesar de ser socia de Tetrad.

68. La Sra. Rosado Falcón, no participó ni tuvo intervención alguna en las comunicaciones entre el suplidor de las bombas, el contratista, los ingenieros y Bermúdez Longo ni tampoco vio propuesta alguna presentada por Bermúdez Longo, por el ingeniero José Luis García ni por JLG Consulting Engineers en relación al Proyecto.

69. La Sra. Rosado Falcón firmó el contrato suscrito entre Tetrad y Bermúdez Longo Díaz Massó en relación al Proyecto, previa consulta, y admitió que en el referido documento se indica que el arquitecto a cargo de los planos es la demandante JLG Consulting Engineering.

70. El Sr. Israel Enrique Alicea Soto, también conocido como 'Kiko', es agrónomo de profesión, y es el administrador de operaciones regionales del DNRA a cargo de las siete regiones, a cargo de la playa, lo que es maquinaria, sistema de costo de inundaciones y trabajo relacionado. Todo lo que sea operaciones tiene que pasar por su firma y tiene funciones de supervisión y participación directa, incluyendo el sistema de control de inundaciones.

71. El Sr. Alicea Soto era el funcionario del DNRA a cargo de todo lo que tenía que ver con la coordinación y supervisión del Contrato. Él estaba a cargo de la supervisión y administración del Contrato como administrador de operaciones regionales.

72. El Sr. Alicea Soto identificó los planos preparados por la demandante como los que fueron sometidos por la demandada Tetrad al DNRA, con relación al Proyecto.

73. El 29 de abril de 2020, el Sr. Luis Hernández, solicitó por correo electrónico al Ing. José Luis García, los planes finales del proyecto.

74. El Sr. Alicea Soto, conoce al Ing. José Luis García, y sabe que trabajó con Tetrad haciendo los dibujos para el Proyecto.

75. Tetrad era el representante exclusivo de la compañía "MWI", fabricante de las bombas utilizadas en el Proyecto objeto del Contrato.

76. Entre otras cosas, de acuerdo con el contrato con MWI, TETRAD venía obligada a proveer apoyo en relación a la instalación de las bombas para todo equipo de MWI vendido en Puerto Rico. Esta obligación incluía comunicarse con MWI y pedirle sus recomendaciones.

77. El Sr. Luis Hernández conocía al Ing. García y a su firma JLG Consulting, pues habían trabajado juntos en propuestas para varios proyectos. El Ing. José Luis García fue quien le recomendó a la compañía Bermúdez Longo como contratista para el Proyecto y en efecto el Sr. Hernández los contrató luego de solicitarle una propuesta.

78. El Sr. Luis Hernández, admite que la compensación a que tiene derecho la parte demandante es de conformidad a lo que establece

la tarifa del Colegio de Ingenieros y Agrimensores de Puerto Rico, basado en el trabajo que hicieron.

79. El Ing. Luis Díaz Díaz trabaja con la firma JLG Consulting Engineers desde el año 1995 cuando se graduó. Comenzó a trabajar en el proyecto a que se refiere el caso el 10 de junio de 2019 cuando hizo la primera visita a las estaciones de bombeo.

80. El Ing. Díaz Díaz conoce a Luis Hernández desde el año 2018 porque ya estaban trabajando un acuerdo para el desarrollo de proyectos mediante el cual ellos trabajaban todo el proceso de preingeniería y desarrollo de planos hasta cierto punto, incluyendo obtención de estimados, y si Tetrad obtenía el contrato, cuando cobraba Tetrad entonces ellos recibían el pago del diseño utilizando la guía del Colegio de Ingenieros, y por su parte se comprometían a no desarrollar ese tipo de proyectos que hacían con Tetrad con competidores de Tetrad.

81. La meta del Contrato a que se contrae este caso es que se diseñaran unos sistemas que pudieran sustituir los que tenía otra compañía corriendo, en una manera similar a lo del contrato de Tetrad. Eran unos sistemas de bombeo que pasaban las bombas existentes eléctricas, de las que muchas estaban dañadas y no funcionaban y ellos diseñaron un sistema para reemplazar lo que estaba allí, que en algunos momentos fue una sustitución completa y en otro momento tuvieron que trabajar alternativas de reutilizar y analizar lo que había.

82. El propósito de esos sistemas de bombeo es canalizar las aguas de lluvia, las correntías de aguas de lluvia, hasta las estaciones para que se bombeen a otro lugar.

83. En las estaciones no había planos y ni el DNRA ni Tetrad proveyeron planos por lo que fue necesario ir de cero a dibujar toda la estructura existente que concerniera y tuvieron que levantar los planos.

84. Ya para el mismo 9 de abril de 2020 estaba listo el set de planos identificado como 'issue for construction".

85. La decisión del DRNA de alquilar las bombas y/o comprarlas al final de cierto tiempo, no afectaba a JLG.

86. A solicitud del Sr. Luis Hernández, el Ing. Díaz Díaz fue quien preparó y ayudó a redactar las propuestas que Tetrad sometió al DNRA.

87. BLMD siguió los planos preparados por JLG y produjeron unos 'shop drawings'. Los 'shop drawings' de BLDM fueron entregados para la revisión por parte de JLG porque es parte del proceso de construcción.

88. En cuanto al Contrato con el DNRA, el trabajo que se iba a hacer era proveer sistemas para remover agua de lluvia de zonas inundables basado en unas especificaciones y requisitos del DRNA.

89. En la mayoría de las estaciones las bombas eran de Rain for Rent. En Baldorioty había una bomba Rain for Rent y había una bomba de MWI.

90. La base que se utilizó para calcular los honorarios de la parte demandante fue el estimado de costo de construcción, el 'probable cost' o 'estimated probable cost of construction'.

91. Una de las cosas al comenzar a trabajar con el proyecto era cuánto iba a costar a la luz de los requisitos del DRNA, por lo que se trabajó con contratistas para que les dieran precios y precios de los materiales. Luis Díaz le envió a Luis Hernández el 'wrap-up'.

92. Cuando se entregaron los planos firmados a Tetrad, ya el Proyecto estaba "substantially completed". Ya había bombas en operación, aunque no todos los proyectos se terminaron el mismo día.

93. La revisión y aprobación de los "submittals" se llama "construction period services"[.]

94. Mediante correo electrónico del 29 de abril de 2020 a las 10:49 de la noche el Sr. Luis Hernández solicitó al Ing. Luis Díaz que le enviara los planos finales del DRNA preparados por JLG, los que le fueron enviados.

95. Mediante correo electrónico del 29 de abril de 2020 a las 10:49 de la noche el Sr. Luis Hernández solicitó al Ing. Luis Díaz que le enviara los planos finales del DRNA preparados por JLG, los que le fueron enviados.

96. Mediante correo electrónico del 19 de junio de 2020 a la 1:37 de la tarde, el Ing. García envió al Sr. Luis Hernández con copia a la Sra. Teresa Reyes Reed, Administradora de JLG, las tres facturas del proyecto identificadas como 4649-4-15-20; 4649-5-11-20; y 4649-6-15- 20, las cuales desglosaban la factura original según solicitado por el Sr. Luis Hernández.

97. Mediante correo electrónico del 20 de agosto de 2020 a las 12:21 pm, dirigido al Sr. Luigi

Hernández con copia a la Sra. Alvia Rosado, el Ing. Díaz Díaz envió nuevamente las tres facturas 4649 anteriormente enviadas. En el correo se expresa:

Luigi:
Saludos, espero que estés bien al recibo de esta. En tu llamada telefónica del viernes 24 de julio me indicaste que finalmente ya habías resuelto con COR3 para que te pudieran pagar el proyecto y que pronto tendrías los fondos para pagarnos nuestros honorarios por el diseño del proyecto. Adjunto las facturas que te hemos enviado anteriormente, déjame saber cuándo puedo recibir el tan esperado pago de estas.
Cordialmente,
Luis

98. El Ing. Juan Charles Santana, fue contratado por la parte demandada en este caso para rendir un informe y lo rindió finalmente con fecha del 26 de abril de 2022.[6]

99. Las categorías definidas en el Manual del CIAPR son las siguientes:

CATEGORY 1 - These are projects of minimum complexity or of a simple utilitarian character involving large duplication of parts or many repetitive elements and where the amount of detailing coordination is a minimum.

CATEGORY 2 - These are projects of average complexity or of conventional character, requiring usual care in their design and details, which may include repetitive use of elements and where a normal amount of coordination is necessary.

CATEGORY 3 – These are projects of above complexity or individual character that require above average study in their design and details, and which may include some repetitive elements and/or where a large amount of coordination is necessary.

CATEGORY 4 - These are projects of complex nature that require extensive study in development and skill in design, which may include a few repetitive elements and/or where an unusual amount of coordination is required.

CATEGORY 5 - These are projects of very complex nature or of an exceptional character and/or unusual artistic importance that requires prolonged study in development and the greatest skill in design and which may include a minimum of repetitive elements, and/or requires an extreme degree of coordination.

---

[6] Este perito fue contratado por la demandada, rindió un informe, fue depuesto y luego no lo utilizó como testigo.

100. Los multiplicadores para aplicarse por categoría de acuerdo con el Manual del CIAPR se definen como sigue:

Tabulations are made for Category 2:

Category 1 - Multiply Value for Category 2 by 0.80
Category 3 - Multiply Value for Category 2 by 1.10
Category 4 - Multiply Value for Category 2 by 1.20
Category 5 – Multiply Value for Category 2 by 1.30

101. De acuerdo con el Manual del CIAPR, la categoría 5 comprende los siguientes servicios de ingeniería:

Engineering
1. Power plants
2. Complex sewage and industrial waste treatment plants
3. Complicated waterfront and marine terminal improvements, including piers.
4. Arched and other complicated dams.
5. Additions to rehabilitation, or reconstruction of projects including electrical, data communication, mechanical and sanitary systems.
6. Co-generation projects.
7. Paralleling switchgear and generations
8. Electrical and mechanical design of gas
9. Landmark projects requiring extensive insulating substations
10. Solid Waste Treatment Plans

102. El Manual del CIAPR ofrece distintas maneras para la compensación de los servicios de ingeniería.

103. El Manual del CIAPR, contempla que cuando se hacen mejoras o reemplazos a una facilidad existente, se compensa distinto al diseñador que cuando es un diseño de algo que no está construido por la complicación adicional que conlleva de evaluar lo existente.

104. El dueño en este caso es el DRNA. La parte demandante era el proyectista del proyecto que necesitaba TETRAD para darle servicios a Recursos Naturales, identificándose a JLG como el Arquitecto en el contrato suscrito con BLDM.

**DETERMINACIONES DE HECHOS ADICIONALES**

105. Los servicios profesionales provistos por JLG consistieron en proveer los análisis, cálculos, diseños, planos, especificaciones y los documentos de construcción necesarios para la instalación de los sistemas de bombeo de agua de lluvia contratados entre el DRNA y TETRAD. El diseño estaría basado en los requisitos de caudal y "lift" de agua especificado por la agencia.

106. Todos los servicios profesionales prestados en este caso por la parte demandante se hicieron conforme los requisitos de la práctica de la profesión de ingeniería y no generaron reclamaciones significativas cumpliendo el propósito para el cual fueron contratados.

107. De hecho, los trabajos realizados por BLDM se basaron en los planos provistos por la parte demandante y el proyecto actualmente se encuentra en operaciones.

108. Contrario a la teoría de la parte demandada, en este caso la prueba demostró que los trabajos de JLG no se limitaron a hacer unos dibujos o planos esquemáticos.

109. En Puerto Rico, existen unas guías aprobadas por el Colegio de Ingenieros y Agrimensores de Puerto Rico que se conocen como el *Manual for Professional Practice and Guidelines for the Compensation of Professional Services del 2006.* Dicho Manual describe las guías para la práctica profesional de ingenieros y agrimensores de una manera ética y con el fin del interés público. Desglosa los servicios esperados y establece guías para la compensación de dichos servicios.

110. Nos merece completa credibilidad el testimonio prestado en corte abierta por el Ing. José Miguel Izquierdo Encarnación (Ing. Izquierdo), cuando declaró que los trabajos realizados por JLG en este caso corresponden a la Categoría 5 del Manual del CIAPR, por su complejidad y naturaleza del trabajo realizado. Dicha categoría incluye alteraciones, modificaciones o [reemplazos] de sistemas existentes.

111. En ese sentido, del bien fundamentado informe pericial del Ing. Izquierdo, se desprende que este trabajo de [reemplazo] de bombas consistía en 10 estaciones de bombas distintas, con estructuras y sistemas de bombeo permanentes diferentes. Por tal razón, JLG tuvo que considerar en el diseño y coordinar su interacción con las facilidades existentes. De hecho, no había planos disponibles para ninguno de los sistemas, por lo que se requirió la preparación de planos de condiciones existentes (as-built) por JLG para poder desarrollar los diseños, entre muchos otros asuntos técnicos.

112. Conforme el Manual y la práctica de la ingeniería existen distintos métodos para calcular el costo de los servicios de ingeniería.

113. El Manual no dice expresamente cuál método es preferible. En ese sentido son las partes las que escogen cuál forma se utilizará.

114. Sin embargo, nos mereció credibilidad el testimonio del Ing. Izquierdo cuando declaró que el más recomendado en la práctica es a base de un porciento determinado del costo de construcción.[7]

115. La prueba en este caso demostró que la parte demandante y demandada acordaron, previo a la realización de los trabajos, que los honorarios a pagarle a JLG serían a base del porciento aplicable por costo de construcción, conforme la categoría del Manual del CIAPR.

116. La parte demandante realizó múltiples gestiones de cobro extrajudiciales a la parte demandada y la misma no pagó lo adeudado.

117. La parte demandada le adeuda a la parte demandante $2,354,658.807[8], por los trabajos realizados en el Proyecto conforme pactado por las partes.[9]

118. La deuda anterior está vencida, es líquida y exigible. (Citas y énfasis en el original).[10]

A tenor con tales determinaciones de hechos, y con el derecho expuesto, el tribunal *a quo* declaró Ha Lugar la *Demanda* presentada por JLG. El foro concluyó que, la prueba presentada por la parte apelada no fue contradicha por TETRAD. A tenor, y luego de llevar a cabo la fórmula dispuesta por el Manual del Colegio de Ingenieros y Agrimensores de Puerto Rico (Manual del CIAPR)[11], el tribunal primario determinó que, existía una deuda vencida, líquida y exigible a favor de JLG, ascendente a $2,354,658.80, en concepto de los trabajos realizados.

---

[7] Conforme el Manual "Costo de Construcción" se define como:
as the total cost to the client for the execution of the work authorized at one time and handled in each separate phase of engineering services, excluding fees or other cost for engineering and legal services, the cost of land, rights of way, legal and administrative expenses, but including the direct cost to the client of all construction contracts; items of construction including labor, materials and equipment purchased or furnished directly by the client (at the market value as if purchased new) for the project.

[8] Esto se compone según las tablas del Manual de la siguiente forma: **$2,000,948.30** (periodo de diseño calculado a base de $1,539,191.00 (base design fee) x 1.3 (complexity category 5 multiplier)) + $**353,710.50** ($272,085.00 (base construction period services) x 1.3 (complexity category 5 multiplier)) = **$2,354,658.80**.

[9] Esto es calculado a base de la propuesta de costo de construcción de $20,000,000.00.

[10] Apéndice del recurso de apelación, págs. 729-745.

[11] Manual for Professional Practices and Guidelines for the Compensation of Professional Services, Colegio de Ingenieros y Agrimensores de Puerto Rico, 2006.

El 14 de diciembre de 2023, la parte apelante presentó *Solicitud de Enmienda a las Determinaciones de Hecho; Reconsideración.*[12] En cuanto a la primera, TETRAD requirió que se incluyeran catorce (14) determinaciones de hechos, relacionadas al contrainterrogatorio del Ingeniero José Luis García. Sobre la solicitud de reconsideración, la apelante sostuvo que, previamente, el foro de instancia había resuelto que, la deuda exigida no era líquida ni exigible. Sostuvo que, dicha determinación no fue recurrida por JLG, por lo que la misma constituía ley del caso. Adujo, además, que, la prueba presentada en el juicio no fue suficiente para demostrar que la referida deuda era líquida.

Mediante *Resolución,* emitida el mismo 14 de diciembre de 2023, y notificada al día siguiente, el Tribunal de Primera Instancia declaró No Ha Lugar la referida solicitud.[13]

Inconforme con la determinación, el 16 de enero de 2024, TETRAD compareció ante nos mediante el recurso que nos ocupa, alegando los siguientes señalamientos de error:

> PRIMER SEÑALAMIENTO DE ERROR:
> Cometió grave error y abusó de su discreción el Tribunal de Primera Instancia al, luego de resolver que la cuantía reclamada no es una suma líquida ni exigible, requisito esencial para toda causa de acción en cobro de dinero, declaró Con Lugar la Demanda apartándose de la Ley del Caso.
>
> SEGUNDO SEÑALAMIENTO DE ERROR:
> Cometió grave error y abusó de su discreción el Tribunal de Primera Instancia al excluir en su Sentencia hechos esenciales producto del testimonio del perito de la corporación apelada que convalidan la inexistencia de un acuerdo entre las partes sobre la cuantía de los honorarios.
>
> TERCER SEÑALAMIENTO DE ERROR:
> Cometió grave error y abusó de su discreción el Tribunal de Primera Instancia al emitir una Sentencia con determinaciones de hechos producto del uso indebido del mecanismo de sentencia sumaria.

---

[12] Apéndice del recurso de Apelación, págs. 751-758.
[13] *Íd.*, págs. 759-760.

Tras varios trámites procesales, el 5 de abril de 2024, TETRAD presentó *Alegato Suplementario*. Luego, el 6 de mayo de 2024, la parte apelada incoó *Alegato en Oposición del Apelado JLG Consulting Engineering, P.S.C. a la Expedición del Recurso de Apelación*.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II**

### A. *Deferencia al Tribunal de Primera Instancia*

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor posición para aquilatar la prueba testifical. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-771 (2013); *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 289 (2011); *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013).

No obstante, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos no debemos intervenir con las determinaciones ni las adjudicaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín*, supra,

pág. 753; *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra.

Como sabemos, "[l]a tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Sin embargo, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad." *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013). Véase, además, *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020); *Umpierre Matos v. Juelle Abello*, 203 DPR 254, 275 (2019), citando a *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). Es por lo que, nuestra más Alta Curia ha definido la *discreción* como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera." *Rivera Gómez v. Arcos Dorados Puerto Rico*, Inc., 2023 TSPR 65, *Pueblo v. Rivera Montalvo*, supra, citando a *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016); *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435, citando a *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna." *Citibank et al. v. ACBI et al.*, supra, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra; *Hietel v. PRTC*, 182 DPR 451, 459 (2011); *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 770 (1977). Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho." *SLG Zapata-Rivera v. J.F. Montalvo*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997); *Hietel v. PRTC*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, supra.

### B. *Teoría General de los Contratos*

Es normativa reiterada que, las obligaciones nacen de la ley, de los contratos y cuasicontratos, de los actos ilícitos, u omisiones en que interviene culpa o negligencia, y cualquier otro acto idóneo para producirlas.[14] Art. 1042 del Código Civil, 31 LPRA § 2992[15]; *Payano v. SLG Cruz-Pagán*, 209 DPR 876, 889 (2022); *Universal Ins. v. Popular Auto*, 207 DPR 228, 238 (2021). Los contratos se perfeccionan cuando median el objeto, consentimiento y causa. Art. 1213 del Código Civil, 31 LPRA § 3391[16]; *Pérez Rodríguez v. López Rodríguez et at.*, 210 DPR 163, 186 (2022). El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA § 3371[17]; *Pérez Rodríguez v. López Rodríguez et at.*, supra; *Aponte Valentín et al. v. Pfizer Pharm*, 208 DPR 263, 284 (2021). Así pues, los contratos son obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez. Artículo 1230, *supra*, 31 LPRA sec. 3451. Por ende, los contratos verbales tienen tanta eficacia como los escritos. *Méndez v. Morales*, 142 DPR 26, 34 (1996); *Vila & Hnos., Inc. v. Owens Ill. de P.R.*, 117 DPR 825 (1986).

Una vez perfeccionado el contrato, lo acordado tiene fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley". Art. 1210 del Código Civil, 31 LPRA § 3375[18];

---

[14] El derecho aplicable al presente caso se remite al Código Civil de Puerto Rico de 1930, puesto que, las relaciones contractuales entre las partes de epígrafe tuvieron lugar previo a la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

[15] Equivalente al artículo 1063 del Código Civil de 2020, 31 LPRA § 8984.

[16] Equivalente al artículo 1237 del Código Civil de 2020, 31 LPRA § 9771.

[17] Equivalente al artículo 1230 del Código Civil de 2020, 31 LPRA § 9751.

[18] Equivalente al artículo 1233 del Código Civil de 2020, 31 LPRA § 9754.

*Aponte Valentín v. Pfizer Pharm.,* supra; *Burgos López et al. v. Condado Plaza,* supra, pág. 8.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver.

**III**

En su **primer** señalamiento de error, TETRAD sostiene que, el foro de instancia se apartó de la ley del caso, puesto que, previamente, había resuelto que la deuda reclamada no era cierta ni determinada, de modo que, la misma no podía ser catalogada como líquida y exigible. Señala que, la parte apelada no recurrió de dicho dictamen, por lo que dicha determinación constituye la ley del caso.[19]

Dicho señalamiento, hace referencia a la *Resolución* emitida por el Tribunal de Primera Instancia, el 17 de octubre de 2022, notificada al próximo día.[20] A través de dicho dictamen, el foro *a quo* declaró No Ha Lugar la primera solicitud de sentencia sumaria presentada por JLG, por entender que existían hechos en controversia que impedían su dictamen. En específico, el tribunal de instancia puntualizó que, en ese momento, no contaba con prueba suficiente para determinar: (1) los términos del contrato; (2) los trabajos realizados y, (3) a cuánto ascendía la compensación total a la que JLG tenía derecho.

Es nuestra postura que, la determinación del foro de instancia respondió al impedimento de concluir, en dicha etapa de los procedimientos, que, en efecto, la deuda era líquida y exigible. En otras palabras, el foro recurrido estaba imposibilitado de resolver por la vía sumaria si la deuda reclamada cumplía con los requisitos que exige nuestro ordenamiento jurídico.

---

[19] Hacemos constar que, dicho señalamiento de error fue incluido en el recurso de *certiorari* presentado previamente por TETRAD, en el caso número KLCE202300165. No obstante, en dicha ocasión, denegamos el auto presentado, por lo que el asunto no fue atendido en los méritos.

[20] Apéndice del recurso de apelación, págs. 121-128.

Ante dicho escenario, y tal y como lo resolvió el tribunal, procedía la continuación del pleito por medio del trámite ordinario, permitiéndole a las partes la presentación de prueba. Al así obrar, y habiendo evaluado toda la evidencia presentada por las partes de epígrafe, el foro recurrido estuvo entonces en posición de resolver la controversia en torno a la deuda. Asunto que, insistimos, no era posible resolver sumariamente en una etapa tan temprana en el pleito. A tenor, razonamos que, la determinación del foro primario se limitó a determinar que el asunto no podía resolverse de manera sumaria, por lo que no cabe hablar de la doctrina de la ley del caso.

Por otro lado, y también en su primer señalamiento de error, TETRAD sostiene que, la prueba presentada por JLG no estableció de forma alguna los elementos necesarios para concluir que la deuda reclamada era líquida y exigible. Indica que, la determinación del foro primario no se sustenta en la prueba desfilada en el juicio.

No obstante, un examen ponderado, tanto del expediente como de la transcripción de la prueba oral del juicio en su fondo, muestra que, no le asiste la razón.

Como es sabido, una deuda se considera líquida cuando la cuantía de dinero es cierta y determinada.[21] A su vez, se considera vencida cuando la misma es exigible, porque puede demandarse su cumplimiento.[22]

Conforme surge del expediente, y tal y como consignó el foro recurrido en su determinación, las partes de epígrafe acordaron que los honorarios que se le pagarían a JLG por sus servicios, serían a base de lo establecido en el Manual del CIAPR.[23] Según el referido manual, al momento de pactarse los honorarios se debe determinar:

---

[21] *RMCA v. Mayol Bianchi*, 208 DPR 100, 108 (2021); *Ramos y otros v. Colón y otros*, 153 DPR 534, 546 (2001).
[22] *RMCA v. Mayol Bianchi*, supra, pág. 109.
[23] Véase, apéndice del recurso de apelación, págs. 25 y 291-292.

(i) a base de qué serán computados los honorarios y, (ii) la categoría del trabajo que se llevará a cabo.

En cuanto a la primera cuestión, el Manual del CIAPR dispone que, los honorarios pueden estar basados, entre otras cosas, en el porcentaje estimado o final del costo total de la construcción.[24] Este es el método más común y conveniente.[25] Sobre la categoría de la obra, el Manual del CIAPR estipula un total de cinco (5), las cuales comprenden distintos tipos de servicios de ingeniería y arquitectura. Cada categoría reconoce un porcentaje, a ser utilizado al momento de calcular los honorarios.

Una vez identificados ambos porcentajes, –entiéndase, el del costo total de la construcción y, el de la categoría aplicable– procede entonces el cálculo establecido por el Manual del CIAPR, para así determinar la cuantía de los honorarios.

Según la prueba desfilada y creída por el tribunal de instancia, el costo de la obra ascendía a $20,000,000, mientras que, el proyecto en cuestión encajaba bajo la categoría número cinco (5) que reconoce el Manual. Al llevar a cabo el cálculo correspondiente[26], el monto total de los honorarios ascendió a $2,354,658.80. Dicha suma cierta es precisamente la reclamada por JLG en su demanda.

A tenor con lo anterior, razonamos que, la determinación del foro primario encuentra total apoyo en la prueba escuchada y aquilatada por este. Del expediente, no surge prueba en contrario que nos permita descartar dicha determinación. Consecuentemente, resolvemos que, el primer error no se cometió.

En su **segundo** señalamiento de error, TETRAD aduce que, el foro primario aquilató erróneamente la prueba testifical presentada

---

[24] Manual del CIAPR, *supra*, pág. 44.
[25] *Íd.*
[26] Véase nota al calce número 6.

por JLG, incluyendo la declaración del Ingeniero Izquierdo Encarnación. Esgrime que, el tribunal de instancia concedió valor probatorio únicamente a una porción del testimonio de este último, ignorando la totalidad del mismo. Como corolario, añade que, el foro *a quo* incorporó hechos en el dictamen recurrido "injustificadamente", que son contrarios a la prueba admitida.

De entrada, es menester señalar que, al discutir su segundo señalamiento de error, TETRAD insiste en que, no existe un acuerdo escrito en el que las partes hayan pactado la cuantía de los honorarios. Añade que, el testimonio del perito convalida la inexistencia de dicho acuerdo. Ahora bien, valga ilustrar a la apelante en cuanto a que, la ausencia de un acuerdo escrito no provoca la nulidad de lo pactado por las partes. Recordemos que, un acuerdo verbal es igualmente válido que uno escrito.[27] En adición, no podemos ignorar que, tan temprano como en la contestación a la demanda, TETRAD admitió haber acordado con el señor José Luis García, Presidente de JLG, "que sus trabajos serían pagados según la tarifa establecida del Colegio de Ingenieros...".[28] Dicha alegación de parte es suficiente para establecer que, en efecto, las partes llegaron a unos acuerdos, aun cuando los mismos no hayan sido reducidos a escrito.

Dicho lo anterior, atendemos propiamente el error señalado. Un examen minucioso de la transcripción de la prueba oral, con particular atención a la declaración del Ingeniero Izquierdo Encarnación, demuestra con claridad que, las determinaciones de hechos realizadas por el foro primario se sustentan en la prueba presentada. No observamos cuestión alguna que nos mueva a prescindir de la deferencia que, de ordinario, debemos concederle al foro de instancia al realizar sus determinaciones de hechos y de

---

[27] *Méndez v. Morales*, supra; *Vila & Hnos., Inc. v. Owens Ill. de P.R.*, supra.
[28] Apéndice del recurso de apelación, pág. 25.

credibilidad.[29] Recordemos que, es dicho tribunal quien se encuentra en mejor posición para aquilatar la prueba, toda vez que, son los tribunales de instancia quienes tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos.[30]

Insistimos en que, las determinaciones de hechos realizadas por el foro primario encuentran apoyo en la prueba desfilada. Así pues, razonamos que el segundo error tampoco fue cometido.

En su último y **tercer** señalamiento de error, la apelante sostiene que, el foro de instancia abusó de su discreción al emitir su dictamen, incluyendo determinaciones de hecho "producto del uso indebido del mecanismo de sentencia sumaria". Aduce que, tales determinaciones carecen de elementos probatorios y, que se sustentan en declaraciones "self serving" de JLG.

Como mencionáramos al comienzo de esta Sentencia, esta es la tercera ocasión en que las partes de epígrafe comparecen ante este foro revisor dentro del mismo pleito. La primera ocasión, TETRAD acudió ante nos mediante recurso de *certiorari*, en el caso número KLCE202300165. Posteriormente, TETRAD instó un segundo auto de *certiorari* ante esta Curia, en el caso KLCE202300765. En dicha ocasión, la parte apelante recurrió de la *Resolución* emitida el 16 de mayo de 2023, por el foro de instancia.[31] En virtud de dicho dictamen, el foro de instancia denegó una solicitud de sentencia sumaria, presentada por JLG, al entender que aun existían controversias que debían ser dilucidadas. Como parte de su dictamen, y tal y como exige nuestro ordenamiento jurídico, el tribunal *a quo* consignó un total de noventa y ocho (98) hechos sobre los cuales razonó que no existía controversia.

---

[29] *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Dávila Nieves v. Meléndez Marín*, supra, págs. 770-771; *Hernández Maldonado v. Taco Maker*, supra; *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra.
[30] *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Meléndez Vega v. El Vocero de PR*, supra.
[31] Apéndice del recurso de apelación, págs. 673-692.

Al presentar su recurso, en el caso número KLCE202300765, TETRAD esgrimió un único señalamiento de error, que resulta análogo al tercer señalamiento de error que hoy trae ante nuestra consideración. En aquella ocasión, y tras una revisión *de novo* de la denegatoria de moción de sentencia sumaria, razonamos que no se justificaba la expedición del recurso de *certiorari*. Esto, pues no encontramos que el foro de instancia hubiese incurrido en pasión, prejuicio o parcialidad al emitir su dictamen. Tampoco apreciamos que el tribunal primario hubiese incurrido en error manifiesto.

Hoy por hoy, analizado en los méritos el señalamiento de error, la parte apelante no logra persuadirnos.

Sin ánimo de repetir, nos reiteramos en que, al examinar ponderadamente tanto el expediente ante nos, como la transcripción de la prueba oral del juicio en su fondo, no surge prueba alguna que nos permita descartar las determinaciones del foro de instancia. Insistimos en que, tanto las determinaciones de hechos como las conclusiones de derecho del foro de instancia estuvieron basadas en la prueba documental y testifical que dicho foro tuvo ante su consideración y de conformidad al derecho aplicable. Una vez más, subrayamos que, el tribunal *a quo* es el que se encuentra en mejor posición para aquilatar la prueba[32], y sus determinaciones de hechos y de credibilidad deben ser merecedoras de gran deferencia por parte de esta segunda instancia judicial.[33] La apelante no logró derrotar la presunción de corrección que merecen dichas determinaciones de hechos. Señalamos, de hecho, que esta no presentó prueba alguna, documental o testifical, impugnando las alegaciones de JLG.

Así las cosas, y reconociendo la deferencia que el tribunal *a quo* se merece, debemos sostener sus determinaciones. Máxime,

---

[32] *Íd.*
[33] *Íd.*

cuando, no encontramos en las actuaciones de dicho foro la existencia de pasión, prejuicio, parcialidad o error manifiesto.[34] En conclusión, el tercer error no se cometió.

De conformidad a todo lo anterior, concluimos que no encontramos base jurídica racional para arribar a un resultado distinto al que llegó el Tribunal de Primera Instancia. En consecuencia, se confirma el dictamen apelado.

**IV**

Por los fundamentos que anteceden, se confirma la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[34] Véase, *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Santiago Montañez v. Fresenius Medical*, supra; *Dávila Nieves v. Meléndez Marín*, supra, pág. 753; *Rodríguez et al. v. Hospital et al.*, supra; *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra.